**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

ALEX N. AMANI,                         )
    *Plaintiff*                        )
v.                                     )
                                       )        NO.
TROOPER PHILIP J. MONTANTE,            )
    *Defendants.*                      )        **JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Alex N. Amani, by his attorneys at the Mizner Law Firm, files this Complaint and states:

### A. Parties.

1.      Plaintiff Alex N. Amani is an adult individual who resides in Erie County, Pennsylvania.

2.      Defendant Trooper Philip J. Montante is a New York State Trooper, based in Erie County, New York.

### B. Jurisdiction and Venue

3.      This Complaint includes claims made pursuant to the Civil Rights Act of 1964, 42 U.S.C. § 1983.

4.      This Honorable Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 & 1343.

5.      Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred

within the territorial jurisdiction of this District and the Defendants are subject to personal jurisdiction within this District.

**D. <u>Facts</u>**

6.      Alex N. Amani is a 41 year old husband and father of seven children, whom he lovingly is raising with his beloved wife, Clarice Amani.

7.      Mr. Amani and his wife, who were born in the Democratic Republic of the Congo, immigrated to the United States in 2010, settling in Erie, Pennsylvania.

8.      In 2016, Mr. Amaini and his wife were naturalized as United States Citizens.

9.      In September 2018, Mr. Amani's family temporarily moved to Montreal, Quebec, for Mrs. Amani to be closer to her extend family while she delivered their son.

10.      During this time,  Mr. Amani was driving for a long-haul trucking company, which caused him to be absent from them for two to three weeks at a time.

11.      In January 2020, Mr. Amani's family moved back to Erie, Pennsylvania.

12.      On January 1, 2020, Mr. Amami rented a large U-haul truck to move all his family's belongings to Erie, PA, along with a dolly to tow their four-door SUV.

13.      In the afternoon of January 2, 2020, Mr. Amani and his family set out from Montreal for Erie, with Mrs. Amani driving the U-Haul and towing the SUV, and Mr. Amani and the children riding in their SUV.

14.      However, due to some difficulty with their vehicle, they did not make much progress and spent the night of January 2 and January 3 in hotels on the way to Erie.

15.      The Amani's had to tow their SUV, and therefore they hired a ride share service to take the family to Erie, because they could not all fit inside the cab of the U-haul truck.

16.     On January 4, 2020, Mr. Amani and his family were travelling west on Interstate 90, towards Buffalo, when the U-Haul truck broke down about 7:00 p.m.

17.     Mrs. Amani was able to drive the U-haul into a nearby rest area on the interstate, where she parked.

18.     The ride-share vehicle, with Mr. Amani and the children, pulled into the rest area and Mr. Amani got out to ask his wife what was going on.

19.     After determining that they could not restart the truck, Mr. Amani called U-haul to find out what they should do. They had purchased trip insurance from U-haul.

20.     A representative of U-haul told Mr. Amani that they would send someone to look at the truck.

21.     After about one hour, a mechanic came, checked the U-haul truck, and could not get the engine to restart.

22.     The mechanic called U-haul, and advised that the truck could not be driven.

23.     At that point, the ride-share told Mr. Amani that he could not delay his trip any longer, and Mr. Amani agreed that he could proceed without them.

24.     U-haul advised that they would send two tow trucks - one for the broken-down vehicle, and one for their SUV.

25.     After about two hours, two tow trucks arrived at the rest stop.

26.     Mr. Amani spoke to the tow truck drivers, and explained how U-haul had advised that his family should ride in the two tow trucks to Erie.

27.     However, the tow truck drivers responded that they did not have enough seat belts for Mr. Amani, his wife and seven children, and that it was therefore illegal for them to transport the entire family.

28.     The tow truck drivers said that they wanted to tow the U-haul and SUV to Erie, and leave Mr. Amani and his family at the rest stop to wait for another ride.

29.     Mr. Amani called U-haul again, and U-haul representative advised that they would send a van to the rest area to transport Mr. Amani and his family to Erie.

30.     U-haul advised Mr. Amani that they should not let the tow truck drivers take their belongings and SUV away, until they were able to travel with their belongings.

31.     However, the tow truck drivers did not want to wait for the additional van, because it was causing them to wait around at the rest area.

32.     The tow truck drivers demanded that they be allowed to take the Amani's belongings to Erie, without waiting for the van which would transport the family to Erie.

33.     Because the U-haul representative specifically advised Mr. Amani not to allow the tow truck drivers to take his belongings until he could travel with them, Mr. Amani refused.

34.     The tow truck drivers kept insisting that Mr. Amani was stopping them from doing their job, and that they needed to go.

35.     At that point, one of the tow truck drivers called the police, and a state trooper patrol car with two troopers inside arrived at the rest area shortly thereafter.

36.     One of the state troopers approached Mr. Amani, who was sitting in the tow truck out of the cold, and began yelling at Mr. Amani saying that he was not letting the drivers do their job.

4

37.     Mr. Amani explained everything that had happened, and that he had been instructed by the U-haul representative to wait until further transportation arrived for his family before allowing the tow truck drivers to leave for Erie.

38.      The state trooper accused Mr. Amani of trying to get the two truck drivers to do something illegal.

39.     Mr. Amani responded that he was not asking the drivers to do anything other than follow U-haul's instructions to wait until sufficient transportation arrived for his family, so that they could accompany their belongings to Erie.

40.     The trooper then ordered Mr. Amani and his two daughters to get out of the tow truck, and they complied by getting out and into the cab of the broken-down U-haul.

41.     The trooper then re-approached and ordered them out of the U-haul.

42.     Mr. Amani asked where he was supposed to go, and stated that he had a contract to lease the U-haul and that there was no reason he could not remain in the cab while he waited for U-haul to send additional transportation.

43.     It was snowing and very cold that night.

44.     Ignoring Mr. Amani's very reasonable questions, Defendant Trooper Montante opened the driver side door, grabbed Mr. Amani's left hand, and pulled him out of the cab.

45.     Defendant Trooper Montante then grabbed Mr. Amani's right hand, twisted it behind his back, and broke Mr. Amani's right hand. Specifically, he broke Mr. Amani's second metacarpal bone in his right hand.

46.     It was about 4:00 a.m. on January 5, when Defendant Trooper Montante broke Mr. Amani's hand.

47.     Mr. Amani never physically resisted the trooper in any way.

48.     Yet, Defendant Trooper Montante put handcuffs on Mr. Amani, and placed him in the patrol car.

49.     Defendant Trooper Montante then advised Mr. Amani that he was not under arrest.

50.     Defendant Trooper Montante claimed that Mr. Amani was illegally preventing the tow truck drivers from doing their job.

51.     Mr. Amani then protested that the broken-down vehicle was not blocking the road, as it was in the rest area, and that he was simply doing what U-haul had told him.

52.     At that point, Mrs. Amani approached from the other tow truck, and asked what was going on.

53.     Defendant Trooper Montante again explained that Mr. Amani was not under arrest, but he was simply being detained to stop the tow truck drivers from doing their job.

54.     Defendant Trooper Montante then un-cuffed Mr. Amani, and let him out of the patrol car.

55.     Mr. Amani asked to speak with the trooper's supervisor, and Defendant Trooper Montante did call his supervisor.

56.     However, when the state police supervisor came, he also began yelling at Mr. Amani that he was trying to have tow truck drivers take his family illegally.

57.     Mr. Amani explained what had happened, and that he was following the U-haul's representative's directions, and that the trooper had injured his right hand.

58.     The supervisor called for an ambulance; however, the trooper who broke Mr. Amani's hand said that he was faking, and that he was not hurt.

59.     The ambulance came, and paramedics put a splint on his hand.

60.     The supervisor asked if he could speak with Mr. Amani alone, and Mr. Amani followed him to his patrol car.

61.     The supervisor told Mr. Amani to get into the back of the patrol car, and told the trooper standing there, who had broken Mr. Amani's hand, to advise him that he was under arrest.

62.     Mrs. Amani came over, and the troopers offered for Mr. Amani to sit in the front passenger seat.

63.     He was not handcuffed, although he was advised he was under arrest. Mr. Amani asked why he was being arrested, adn the trooper responded that "you will know when you get to the station."

64.     Shortly thereafter, Mr. Amani was taken to the police station in Lancaster, New York for booking, leaving behind his wife and children.

65.     After Mr. Amani was taken away, a van from U-haul arrived, and they drove to the police station, along with the two tow truck drivers.

66.     Mr. Amani was fingerprinted, and put in a holding area for the remainder of the night.

67.     Mr. Amani's family and the tow truck drivers, stayed outside the station all night.

68.     In the morning of January 5, 2020, Mr. Amani was given an "Appearance Ticket" with a court date of January 21, 2020, and told him he was free to go.

69. The Appearance Ticket stated that Mr. Amani was charged with Obstructing Government Administration, and Resisting Arrest.

70. Mr. Amani asked where he was supposed to go, and the trooper responded that his wife and children were outside waiting for him.

71. Before he left, the supervisor called Mr. Amani and his wife into his office, and asked what had happened.

72. Mr. Amani explained the whole incident, and asked the supervisor if he had resisted at all when the supervisor told him he was under arrest.

73. The supervisor conceded he had not, and did not offer any explanation for the charge.

74. Then the supervisor told them they were free to go.

75. Before leaving the station, Mr. Amani again spoke with a representative with U-haul, who advised them to go to the U-haul station in the Buffalo area to change trucks. U-haul paid movers to transport all of their belongings from the broken-down truck to a new U-haul truck.

76. Mr. Amani stayed with their belongings, and his wife and children drove in the van U-haul provided to Erie.

77. Once the transfer of his family's belongings between U-haul trucks was complete, Mr. Amani proceeded to Erie himself.

78. Mr. Amani did not arrive in Erie with the U-haul truck until January 6, 2020, about noon.

79. Thus, it took four full days to transport his belongings from Montreal to Erie.

80.     Shortly after arriving in Erie, Mr. Amani went to the Med-express over his injured hand, which sent him to UPMC Hamot for x-rays.

81.     He was told that he had a broken third metacarpal bone, and was referred to a specialist for casting.

82.     He was advised that he would need to wear the cast for up to six weeks.

83.     The doctor advised that Mr. Amani could not work for six weeks. However, because Mr. Amani's had was healing slowly, the doctor advised that he could not work for twelve weeks.

84.     Mr. Amani advised Max Freight, a trucking company that he drove for as an independent contractor, that he would not work until the end of March due to his broken hand.

85.     As a result, Mr. Amani has been without any income since January 4, 2020. He has fallen behind on his credit card payments, his car payment with Ally Financial, his federal student loans, his personal loan through Widget financial, and is being forced to use his savings to pay rent and purchase food.

86.     Mr. Amani's credit score has also been negatively affected.

87.     Mr. Amani has not been able to purchase necessary school supplies for his children, who are at an unfamiliar school in Erie.

88.     On January 21, 2020, Mr. Amani appeared for his court date in Lancaster, New York, where the Honorable Anthony Cervi ordered that the charges would be dismissed on July 21, 2020, so long as Mr. Amani led "a law abiding life" until that date.

## COUNT I

## VIOLATION OF THE FOURTH AMENDMENT - EXCESSIVE FORCE

89.     The foregoing averments are incorporated herein by reference as if fully set forth

herein.

90.     Defendant Trooper Montante illegally used excessive and unreasonable force

under the circumstances against Mr. Amani in violation of Mr. Amani's Fourth Amendment

right to be secure in his person and not to be subjected to excessive force.

91.     Mr. Amani had not committed a crime, but was having a motor vehicle

emergency when Defendant Trooper Montante used excessive and unreasonable force against

him.

92.     Defendant Trooper Montante was acting under color of the state law when he

intentionally committed the acts giving rise to Mr. Amani's claims.

93.     Mr. Amani was not armed and did not pose any threat to the safety of Defendant

Trooper Montante or others.

94.     The physical force applied by Defendant Trooper Montante was sufficiently

severe to cause Mr. Amani to suffer unnecessary injury.

95.     Mr. Amani did nothing to provoke Defendant Trooper Montante and was in the

process of protecting his family and himself from the harsh weather conditions in a vehicle that

he was in lawful possession of.

96.     Defendant Trooper Montante's conduct under the circumstances was an excessive

use of force; a reasonable police officer in Trooper Montante's position would not have used

such force.

97.     The intentional acts committed by Defendant Trooper Montante caused substantial injuries to Mr. Amani and violated Mr. Amani's Fourth Amendment right not to be subjected to excessive force and to be secure in his person.

98.     Defendant Trooper Montante's conduct was outrageous, willful, and wanton, and demonstrated a reckless disregard of the rights of Mr. Amani, and punitive damages are therefore appropriate.

WHEREFORE, Plaintiff Alex N. Amani, requests that this Honorable Court enter judgment in his favor and against Defendant Trooper Philip J. Montante in an amount in excess of $75,000.00, along with such other relief as this Honorable Court may deem appropriate or just.

**COUNT II**

**VIOLATION OF THE FOURTH AMENDMENT - UNLAWFUL SEIZURE OF PLAINTIFF'S PERSON**

99.     The foregoing averments are incorporated herein by reference as if fully set forth herein.

100.    On January 4, 2020, Defendant Trooper Montante unlawfully seized Mr. Amani person without justification in violation of the Fourth Amendment to the United States Constitution.

101.    Defendant Trooper Montante was acting under the color of the state law when he, without justification, exercised his authority as a State Trooper by inexplicably seizing Mr. Amani without a warrant while he was in the midst of a motor vehicle emergency.

102.    Mr. Amani had not committed a crime, but was having a motor vehicle when he was unlawfully seized by Defendant Trooper Montante.

103.    A reasonable police officer in Defendant Trooper Montante's position would not have seized Mr. Amani because Mr. Amani was having a motor vehicle emergency.

104.    Mr. Amani was not violent and/or threatening and did not act in any way that would not cause a reasonable state trooper to have reasonable suspicion or probable cause to believe a crime had been or was being committed or that Mr. Amani posed a threat to Defendant Trooper Montante or those around him.

105.    Mr. Amani was not free to leave due to Defendant Trooper Montante's use of physical force and was therefore seized within the meaning of the Fourth Amendment.

106.    The excessive force used by Defendant Trooper Montante caused Mr. Amani  to suffer serious physical injuries as set forth above.

107.    By unlawfully seizing Mr. Amani, Defendant Trooper Montante caused Mr. Amani, who had never before had any previous altercations with law enforcement, to suffer a violation of his Fourth Amendment right to be secure in his person.

108.    Defendant Trooper Montante's conduct was outrageous, willful, and wanton, and demonstrated a reckless disregard of the rights of Mr. Amani, and punitive damages are therefore appropriate.

WHEREFORE, Plaintiff Alex N. Amani, requests that this Honorable Court enter judgment in his favor and against Defendant Trooper Philip J. Montante in an amount in excess of $75,000.00, along with such other relief as this Honorable Court may deem appropriate or just.

Respectfully submitted,


MIZNER LAW FIRM

By: /s/ John F. Mizner

PA Supreme Court ID 53323
John F. Mizner
jfm@miznerfirm.com

PA Supreme Court ID 322823
Joseph Caulfield
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorney for the Plaintiff*

**JURY TRIAL DEMANDED**


February 24, 2020